[Civ. No. 77. Fifth Dist. Jan. 23, 1962.]

SHELL OIL COMPANY, Petitioner, v. INDUSTRIAL AC-
CIDENT COMMISSION, BETTY BYRD et al., Re-
spondents.

A. J. Fabris, C. D. Walz and David D. Ring for Petitioner.

Everett A. Corten and Emily B. Johnson for Respondents.

STONE, J.—Petitioner, Shell Oil Company, seeks annulment of an award to the widow and minor children of Charles H. Byrd, deceased. At the time of his death, Byrd was employed by petitioner as a service station manager in Merced, California. On March 16, the Shell Oil Company held a dinner meeting in Stockton, which was called the Spring Dealers' Meeting. Shell dealers in the area and their "key men" were invited to attend. The meeting began at 6:45 with cocktails served from 6:45 to 7:30; dinner was served from 7:30 to 8:30 p. m. After dinner a Shell news commentator described the Shell Company's local radio advertising project, and a skit was presented relating to service station operation. The area retail manager talked for about 15 minutes, and the meeting ended at 10 p. m.

Petitioner contends that Byrd was not acting within the scope of his employment by attending the meeting because it was a social event, no attendance records were kept, and no service station manager was compelled to go. It is also pointed out by petitioner that no transportation by way of either expenses or company car was furnished Byrd. As a matter of fact, this action arose out of Byrd's use of his own car to get to the meeting. His car broke down within the city limits of Stockton, on the way to the meeting. Mr. Byrd had as passengers two of his "key men" whom he was taking to the meeting. They were unable to determine immediately what was wrong with the automobile, so they parked it at a Shell station and continued on to the meeting. They returned to Merced by other transportation. The meeting in Stockton was held Wednesday night. According to the record, Mr. Byrd and his employees were too busy Thursday to get the automobile, but on Friday he and one of his employees, Harold Burk who was on his day

off, drove from Merced to Stockton in Byrd's pickup truck for the purpose of towing the automobile back to Merced.

Mr. Byrd and his employee stopped enroute from Merced to Stockton and borrowed a drawbar with which to tow the automobile behind the pickup truck. It was the purpose of Mr. Byrd to tow his automobile back to his service station and repair it. On the way back, the vehicles jackknifed, and Byrd was killed.

Petitioner makes two principal arguments in support of annulment of the order: first, that Byrd was not acting within the course and scope of his employment by attending the dealers' meeting in Stockton; and, second, that if it be conceded for the sake of argument only that Byrd was acting within the scope of his employment by attending the meeting in Stockton, the purpose of the trip or attendance at the meeting terminated when Byrd arrived home that night by other transportation. In other words, when Byrd returned to Stockton on Friday to get his car, he was no longer acting within the course and scope of his employment, but was on a personal errand.

We are not persuaded by petitioner's first argument, that Byrd's attendance at the dealers' meeting in Stockton was not within the course and scope of his employment. In the first place, the meeting was entitled "Spring Dealers' Meeting." The sole purpose of it was to acquaint the dealers and key employees with petitioner's radio advertising program, to instruct them on service station operation, and to have them listen to a talk by the district sales manager. That attendance was not compulsory or that no record of attendance was kept is not determinative. The company invited the managers to the meeting to further its own purposes. Certainly when Byrd attended the meeting he was engaged upon a mission which incidentally or indirectly contributed to the service and benefit of the employer. The governing principle is stated in *Boynton* v. *McKales*, 139 Cal.App.2d 777 [294 P.2d 733], a case involving a parallel situation. The court said, at page 789:

"If the employee is not simply on his way from his home to his normal place of work or returning from said place to his home for his own purpose, but is coming from his home or returning to it on a special errand either as part of his regular duties or at a specific order or request of his employer, the employee is considered to be in the scope of his employment from the time that he starts on the errand until

he has returned or until he deviates therefrom for personal reasons. [Citations.] To such special missions the general test as to scope of employment applies. It is not necessary that the servant is directly engaged in the duties which he was employed to perform, but included are also missions which incidentally or indirectly contribute to the service, incidentally or indirectly benefit the employer. [Citations.] The attendance at a social function, although not forming part of the normal duties of the employee, may come under the 'special errand rule' if the function or the attendance was connected with the employment and for a material part intended to benefit the employer who requested or expected the employee to attend.''

Byrd's attendance at the meeting falls within the rationale of *Boynton* v. *McKales*.

 Petitioner's second principal contention is that when Byrd returned to Merced from the Stockton meeting his special mission for his employer terminated, so that when he returned to Stockton two days later to get his car, he was on a personal errand. At first impression the argument appears sound, and it would seem that Byrd had completed his special mission and was on a purely personal errand for personal reasons at the time of the accident. On considering the question, however, we recognize that had a company car been furnished, and had the company car broken down in a rural area between Merced and Stockton rather than in the City of Stockton, and had Byrd left the company car at some farmhouse or some wayside place of business, the employer would have expected him to return later and pick up the company car. Certainly as an employee he would have been obliged to take whatever steps were necessary to protect company property. It is also clear that the company must have anticipated that Byrd would furnish his own transportation. This follows because no company car or transportation at company expense was furnished the station managers who were invited to attend the sales meeting. Since the company expected Byrd to furnish his own car, it is only reasonable that it should have anticipated that the car might become disabled. The fact that it broke down in the City of Stockton, where he left it at a Shell station, does not change the situation. The car broke down while Byrd was acting within the scope of his employment, a result which should have been anticipated by the employer. That he would return to get his vehicle and not simply abandon it, should likewise have been anticipated by

his employer. Thus, by reason of the fortuitous circumstances which developed, Byrd had to return to get his vehicle and he was still performing a service which was directly connected to the original errand. Byrd's death while enroute from Stockton to Merced occurred in the course of his employment.

Another argument of petitioner is that the normal use of the pickup truck by Byrd in his business was confined within the radius of a few miles of Merced. Thus, it is argued, when Byrd drove the pickup some 70 miles to Stockton he was acting outside the scope of his employment. However, the agreement Byrd had with petitioner did not restrict the use of the pickup truck. The record reveals that Byrd's practice of not going more than 10 or 12 miles from his place of business in the pickup truck was not induced by the employer-employee agreement, but by economic considerations. It simply was not profitable to provide pickup service more than a few miles from the station. There was nothing in the contract to prevent Byrd from driving his pickup truck to Stockton, or any place else, to accommodate a valued customer or, for that matter, for a casual customer willing to pay for the service and thus make it economically feasible. Conversely, it could be argued that use of the pickup truck to tow a disabled vehicle to the service station was a normal business activity and an act within the scope of Byrd's employment.

Petitioner stresses the fact that the agreement between Byrd and Shell Oil Company prohibited him from making any major automobile repairs at the service station. Petitioner contends that since Byrd contemplated repairing his car at the service station, his towing of the car from Stockton to Merced was outside the scope of his employment. We could dispose of this argument by calling attention to the fact that the commission found against petitioner on this point, and rest that issue on the rule enunciated in *Gonzales* v. *Industrial Acc. Com.*, 50 Cal.2d 360, 364 [325 P.2d 993], wherein the Supreme Court said:

"Findings of the Industrial Accident Commission are not subject to review on the ground that there is no substantial evidence to sustain them, except insofar as it may appear that they have been made without *any* evidence whatever in their support."

It could be inferred from the commission's findings that the replacement of a cracked head on the employee's own car was not considered to be a major automobile repair within the meaning of the agreement. However, we do not think it is

necessary to decide the question on this ground. Whether Byrd intended to repair the automobile himself at the service station is immaterial since the manner or place of repair had nothing to do with the return of the vehicle. Had he been returning it to Merced to have a private garage repair it, or had he been returning it to his home to repair it there, the necessity of returning the car was the same. Had Byrd actually returned the vehicle to his service station and had the accident occurred while he was repairing it in the service station, then counsel's argument would require consideration.

In view of the fact that Byrd's return of his vehicle to Merced was a natural, normal and necessary result of his performing a special errand for his employer, we conclude that he was acting within the scope of his employment at the time the accident occurred. We believe this conclusion is in accord with statutory direction and judicial precedent which impel a liberal construction of the workmen's compensation laws. Labor Code section 3202 provides:

*"Liberal construction.* The provisions of Division IV and Division V of this code shall be liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment."

(See *Subsequent Injuries Fund* v. *Industrial Acc. Com.,* 39 Cal.2d 83, 91 [244 P.2d 889] ; *Aetna Life Ins. Co.* v. *Industrial Acc. Com.,* 38 Cal.2d 599, 604-605 [241 P.2d 530] ; *Subsequent Injuries Fund* v. *Industrial Acc. Com.,* 151 Cal.App.2d 606, 611 [312 P.2d 78] ; *Bianco* v. *Industrial Acc. Com.,* 24 Cal.2d 584, 589 [150 P.2d 806].)

The award is affirmed.

Conley, P. J., concurred.

BROWN, J., Dissenting.—The facts are simple and are well stated in the majority opinion. I am in accord with the conclusion that, when attending the "Spring Dealers' Meeting" on March 16th, decedent was on a "special errand" or "special mission" and was rendering services for his employer from the time he left his home until his return thereto. Had the tragic accident occurred during that round trip, his resultant death would have been compensable. Numerous California cases are in harmony with that conclusion, and need not be cited here.

But that is not our case. Mr. Byrd left his home in Merced, attended the dealers' meeting in Stockton, and safely returned to his home, leaving behind his disabled automobile. He then had completed his "special mission." An important test of employer liability is whether or not the employee is acting within the course and scope of his employment at the time he sustains the injury. It seems to me that the majority opinion severs the course and scope of employment rule from the person and activities of the employee, and transfers it to his motor vehicle. It seems to hold that, until Byrd successfully and safely conveyed his disabled car to his home, the employment continued. For how long? Suppose that, for some reason, he had been unable to obtain his car on the second trip to Stockton. Would the protective cloak of the Workmen's Compensation Act fall about his shoulders throughout a third trip, so long as he was reasonably diligent in his efforts to get his car home? Not so.

Courts of this state have held that, where the employee is required to travel from place to place on a "business errand" or "special mission," an exception to the going and coming general rule exists, and the risks of such travel are directly incident to the employment itself (*Sun Indem. Co.* v. *Industrial Acc. Com.*, 76 Cal.App. 165 [243 P. 892], employee injured while *going* home; *Western Pacific R. R. Co.* v. *Industrial Acc. Com.*, 193 Cal. 413 [224 P. 754], employee injured after *leaving* home). (Italics added.)

The rule is well stated by Mr. Campbell, in volume 1 Workmen's Compensation, section 184, page 173: "Where an employee is requested by his employer to return and do 'a service outside his regular duty,' the sole purpose of which was to help his employer in the latter's business, a different rule applies, and the employee is then on a special errand. The special request for unusual service is the decisive factor which brings the employee, *throughout the entire trip to and from the place of business,* in the course of rendering a service for the employer." (Italics added.)

Under the principle enunciated in the cases above cited, the risks of Mr. Byrd's travel to and from Stockton on March 16th fall fairly on his employer's head. But that trip was safely made. He then doubled the exposure to risk by undertaking a second trip and substantially increased the peril by attempting to tow his disabled car a distance of 70 miles, without the knowledge or consent of his employer. Neither justice nor reason require that the additional risk and the greater expos-

ure to peril should be anticipated by, and visited upon, his employer.

While cognizant of the duty imposed upon courts to construe liberally the coverage of the Workmen's Compensation Act and the liability for injury arising out of and within the course of the employment, I must conclude, on the record before us, that the injuries which caused Mr. Byrd's death did not arise out of or in the course of the employment and were not proximately caused by the employment.

To uphold the award granted by the commission would do violence to the purpose and the spirit of the Act and would penalize an employer by extending his liability far beyond the established bounds of the "business errand" or "special mission" exception to the going and coming rule, imposing liability until not only the employee, but all of his personal property used in connection with the special mission, is safe at home.

For the foregoing reasons the award of the respondent commission should be annulled.

Petitioner's application for a rehearing was denied February 19, 1962. Brown, J., was of the opinion that the application should be granted. Petitioner's application for a hearing by the Supreme Court was denied March 21, 1962.